**GLANCY PRONGAY & MURRAY LLP**
LIONEL Z. GLANCY (#134180)
ROBERT V. PRONGAY (#270796)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: lglancy@glancylaw.com

*Attorneys for Plaintiff*
[Additional Counsel Listed On Signature Page]

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT CLEM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>8POINT3 ENERGY PARTNERS LP, 8POINT3 GENERAL PARTNER, LLC, CHARLES D. BOYNTON, MARK R. WIDMAR, NATALIE F. JACKSON, ALEXANDER R. BRADLEY, THOMAS C. O'CONNOR, NORMAN J. SZYDLOWSKI, and MICHAEL W. YACKIRA,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

CLASS ACTION COMPLAINT

Plaintiff Robert Clem ("Plaintiff"), by and through his attorneys, alleges the following on information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge.

**NATURE OF THE ACTION**

1. This action stems from a proposed transaction announced on February 5, 2018 (the "Proposed Transaction" or "Merger"), pursuant to which 8point3 Energy Partners LP ("8point3" or the "Company"), and related entities, will be acquired by the global asset management firm Capital Dynamics, Inc. ("Capital Dynamics"), along with certain other co-investors (collectively, the "Acquirers").

2. On February 5, 2018, the board of directors of 8point3 General Partner, LLC ("8point3 GP" or the "General Partner"), 8point3's general partner (the "Board"), caused the Company to enter into an agreement and plan of merger with the Acquirers (the "Merger Agreement"). Pursuant to the terms of the Merger Agreement, the Acquirers will purchase each issued and outstanding share—which consists of Class A and Class B shares—of 8point3's limited partnership interest for $12.38 in cash, provided closing occurs as scheduled, *i.e.*, on May 24, 2018 (the "Merger Consideration").

3. The success of the Merger is conditioned on 8point3 receiving a "yes" vote from the holders of a majority of its outstanding shares of limited partnership interests, including Class A shares (excluding the General Partner and its affiliates) and Class B shares. One hundred percent of the Class B share are indirectly owned by the Company's two sponsors, First Solar, Inc. ("First Solar") and SunPower Corporation ("SunPower," and together with First Solar, the "Sponsors"). The Sponsors have entered into a support agreement executed with the Company to vote their Class B shares in favor of the Merger (the "Support Agreement"). The vote on the Merger is scheduled for May 23, 2018.

4. On April 6, 2018, Defendants filed a definitive proxy statement on a Schedule 14A (the "Proxy") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction. As described herein, the Proxy omits material information with respect to the Proposed Transaction, which renders it false and misleading, in violation of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 140.14a-9 ("Rule 14a-9") promulgated thereunder.

5. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' wrongdoing described herein.

**JURISDICTION AND VENUE**

6. This Court has subject matter jurisdiction over all claims asserted herein pursuant to Section 27 of the Exchange Act, 15 U.S.C § 78aa, and 28 U.S.C. § 1331, as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

7. This Court has personal jurisdiction over all of the Defendants because each is either a corporation that conducts business in, and maintains operations within, this District, or is a person or entity that is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

8. Venue is proper under 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

**PARTIES**

9. Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of 8point3 Class A shares.

10.     Defendant 8point3 is a Delaware corporation, with its principal executive offices located in San Jose, California.  8point3's common stock is listed on the NASDAQ under the symbol "CAFD."

11.     Defendant 8point3 GP is a Delaware corporation, with its principal executive offices located in San Jose, California.  8point3 GP manages 8point3's operations and activities through 8point3 GP's directors and executive officers.

12.     Defendant Charles D. Boynton is Chairman of the Board and Chief Executive Officer of 8point3 GP.  He is also an Executive Vice President and the Chief Financial Officer of SunPower.

13.     Defendant Mark R. Widmar is a director on the Board and the Chief Executive Officer of First Solar.

14.     Defendant Natalie F. Jackson is a director on the Board, as well as the Vice President of Operations for 8point3 GP and the Managing Director for Project Finance at SunPower.

15.     Defendant Alexander R. Bradley is a director on the Board and the Chief Financial Officer of First Solar.

16.     Defendant Thomas C. O'Connor is a director on the Board.  Defendant O'Connor was a member of the Board's Conflicts Committee, established to negotiate and evaluate the Proposed Transaction (the "Conflicts Committee").

17.     Defendant Norman J. Syzdlowski is a director on the Board.  Defendant Syzlowski was a member of the Board's Conflicts Committee.

18.     Defendant Michael W. Yackira is a director on the Board.  Defendant Yackira was a member of the Board's Conflicts Committee.

19. The defendants listed in ¶¶ 12-18 are collectively referred to herein as the "Individual Defendants."

20. 8point3, the General Partner (8point3 GP), and the Individual Defendants are referred to herein as "Defendants."

21. Non-Party First Solar is a leading global provider of comprehensive solar systems and trades on the NASDAQ under the symbol "FSLR."

22. Non-Party SunPower designs, manufacture and delivers high efficiency, high reliability solar panels and systems and trades on the NASDAQ under the symbol "SPWR."

23. Non-Party Capital Dynamics is an independent, global asset manager, investing in private equity, private credit and clean energy infrastructure. Capital Dynamics is headquartered in Zug, Switzerland and has USD$15 billion in assets under management and advisement.

## SUBSTANTIVE ALLEGATIONS

24. 8point3 was formed by the Sponsors to own, operate and acquire solar energy generation projects. The Company's primary objective is to generate predictable cash distributions that grow at a sustainable rate, achieved by acquiring high-quality solar assets, primarily developed by the Sponsors, which generate long-term contracted cash flows. The Company is managed and operated by the General Partner through the General Partner's directors and executive officers.

25. Although the Proxy provides 8point3's shareholders with an overview of the Proposed Transaction, it omits certain critical information, which renders portions thereof materially incomplete and/or misleading, in violation of the Exchange Act provisions discussed herein. As a result, 8point3's shareholders lack material information necessary to allow them to make an informed decision when voting on the Merger.

26. In particular, the Proxy contains materially incomplete and/or misleading information concerning, *inter alia*: (i) potential conflicts of interest and bad faith that may have tainted the Merger negotiation and sales process; and (ii) the valuation analyses performed by the Conflicts Committee's financial advisor in support of its fairness opinions, including certain of the projections upon which it relied.

*Material Omissions Concerning Potential Conflicts of Interest and Bad Faith that May have Tainted the Merger Negotiation and Sales Process*

27. The Proxy fails to disclose material information regarding potential conflicts of interest and bad faith that may have tainted the Merger negotiation and sales process.

28. The Proxy does not disclose whether, and if so, which, of the General Partner's executive officers, directors, or management will remain employed with the post-Merger entity after completion of the Merger. Nor does the Proxy indicate whether any employment related discussions or negotiations occurred between the Acquirers and such individuals during the Merger negotiations, which could have potentially tainted the sales process. Any communications regarding post-transaction employment and Merger-related benefits during the negotiation of the underlying transaction must be disclosed to shareholders, as they would indicate potential conflicts of interest.

29. The plausibility of the existence of such conflicts of interest is bolstered by the fact that, as some courts have recognized, in the context of a going private transaction—similar to the instant transaction—members of the target company's management are inherently susceptible to becoming conflicted by the prospect of obtaining lucrative employment and/or equity interests in the post-Merger entity.

30. With respect to the selection of Evercore Group L.L.C. ("Evercore") to be the Conflicts Committee's financial advisor, the Proxy (at page 62) discloses that Evercore provided the following services for the Company within the prior two years:

CLASS ACTION COMPLAINT
5

> (a) Evercore's opinion and work performed for the GP Conflicts Committee inconnection with the GP Conflicts Committee's consideration of the Partnership's acquisition of (i) interests in the Henrietta Project from SunPower, (ii) the Stateline Project in California from First Solar and subsidiaries of SunPower and (iii) FSAM Kingbird Solar Holdings, LLC from a subsidiary of SunPower and (b) Evercore's work performed for the GP Conflicts Committee in connection with other potential acquisitions by the Partnership of certain assets from SunPower, First Solar and their respective affiliates. For each of the engagements described in this paragraph Evercore received fees and reimbursement of certain out-of-pocket expenses.

However, the Proxy fails to disclose any information pertaining to the amount of the fees received by Evercore in any of (or in total for) the above mentioned transactions. Given the extent of Evercore's relationship with the Company prior to the Proposed Transaction, it is readily conceivable Evercore would be incentivized to preserve its relationship with the Company going forward, especially where it is unknown whether any members of the Board, key executives, or management will remain with the Company post-Merger. Evercore, therefore, may have justified a sale that is unduly favorable to the buyer, rather than the public shareholders, whose interests Evercore was retained to protect. As such, shareholders are entitled to disclosure of the compensation received by Evercore over the prior two-years to determine whether Evercore was suffering from debilitating conflicts of interest.

31. The Proxy also fails to disclose any financial information pertaining to the Conflicts Committee's decision to forgo its Right of First Offer Agreement ("RFOA") related to potential dropdown transactions—where a sponsor or general partner transfers assets or ownership interests to the limited partnership—including First Solar's California Flats solar generation project and Cuyama solar generation project, both in California, and SunPower's Boulder Solar I solar generation project in Nevada. (Proxy at 35). The Conflicts Committee decided to forgo its RFOA in April 2017, after the Sponsors had begun shopping their interests in the Company. The Proxy further fails to disclose the ultimate sale prices associated with the Cuyama Project and California Flats Project, the latter of which was sold to an affiliate of Capital Dynamics, although

it does provide that "both projects were sold at a purchase price above the price offered to the Partnership." This information is material to 8point3's shareholders because it enables them to properly determine whether the Sponsors began shedding assets to third-parties (including an affiliate of Capital Dynamics) to benefit themselves, where the Company had a right to purchase the same assets at prices below the ultimate sale prices, and then resell them at a profit.

32. Moreover, the Proxy discloses (at page 40) that on September 29th, October 11th, and October 15th, three potential bidders, identified as Bidder B, Bidder C, and Bidder D, respectively, terminated their participation in the bidding process because the bids each were prepared to submit were "materially lower" than their respective prior bids due, in part, to "internal issues." However, these "internal issues" were neither described nor summarized. Such information would be material to 8point3's shareholders because the original bids received from each of the three bidders were in the range of $14.00 to $15.19 (significantly higher than the $12.38 Merger Consideration).

33. In regard to bidders, the Proxy discloses that a standstill provision—which generally restricts a bidder from purchasing a target company's shares or taking certain other actions that may lead to a change of control unless the target company's board approves that action—was included in the confidentiality agreement each bidder entered into with the Company prior to receiving internal documents. (Proxy at 36). However, the Proxy fails to disclose whether the standstill provision or confidentiality agreement also contained "don't ask, don't waive" provisions that are or were preventing bidders from submitting superior offers to acquire the Company. This material information is necessary to enable investors to properly determine whether all strategic options were fully vetted, and whether the Proposed Transaction is leaving any potential superior offers on the table.

34.     Furthermore, on November 28, 2017, the Conflicts Committee "determined to propose to the Sponsors that the public holders of Class A shares receive $15.00 per Class A share." However, the Proxy (at pages 43-48) fails to disclose "the key assumptions made my management in connection with its financial projections, certain sensitivity cases to management's financial projections, Evercore's preliminary financial analysis of the potential transaction, and the proposed division of proceeds between the public holders of Class A shares and the Sponsors," which led to a determination that the fair value of each Class A share was $15.  More importantly, the Proxy fails to disclose what changed in relation to these metrics between November 28, 2017 and February 5, 2018, which supported Evercore and, based thereon, the Conflicts Committee in determining that the $12.38 Merger Consideration was fair.

35.     The disclosure of the information discussed in ¶¶ 27-33 above would be material to 8point3's shareholders because they need to be fully informed about whether their fiduciaries had the shareholders' best interest in mind when negotiating the Proposed Transaction, and whether the Board proceeded in good faith when negotiating the Proposed Transaction.

***Material Omissions Concerning Evercore's Valuation Analyses***

36.     A financial advisor's opinion of a proposed transaction is one of the most important process-based underpinnings of a board's recommendation of a transaction to its shareholders. Thus, it is imperative for shareholders to be able to understand what factors might influence a financial advisor's analytical efforts.

37.     The Proxy fails to disclose material information with respect to various financial analyses performed by Evercore in support of its fairness opinion.  For example, with respect to Evercore's *Levered Discounted Cash Flow Analyses* ("DCF"), the Proxy (at pages 58-59) discloses that the levered DCF Analysis was run on four different scenarios:

> Evercore performed a levered discounted cash flow analysis of the Partnership by valuing the after-tax free cash flows to be received by the Partnership based on the 8point3 Financial Projections – Base

> Case and the 8point3 Financial Projections – MD Solar Merchant Sensitivity. In addition, Evercore performed the levered discounted cash flow analysis sensitizing (i) the 8point3 Financial Projections – Base Case's forward price curve for merchant power for a 10.0% increase and a 10.0% decrease (the "Merchant Price Curve Sensitivity") and (ii) the 8point3 Financial Projections – Base Case's total projected generation for a 5.0% increase and a 5.0% decrease (the "Generation Sensitivity").

However, the Proxy only discloses financial projections relied upon for the Base Case and the MD Solar Merchant Sensitivity Case, and fails to disclose the inputs and assumptions for the Merchant Price Curve Sensitivity or Generation Sensitivity analyses. (*See* Proxy at 64).

38.  Additionally, the Levered DCF Analyses were based on Cash Available for Distribution, but there is no line item detail disclosing the inputs and assumptions that resulted in the respective Cash Available for Distribution figures. The Proxy also states that "[t]he Partnership's after-tax free cash flows to equity reflect the use by the Partnership of net operating losses to offset taxable income and are equivalent to the Cash Available for Distribution," however the "net operating loss" inputs and assumptions are not disclosed. (*See* Proxy at 58-59).

39.  With respect to Evercore's *Unlevered DCF Analyses*, the Proxy fails to make the same disclosures as described in relation to the Levered DCF Analyses, including the inputs and assumptions for the Merchant Price Curve Sensitivity or Generation Sensitivity analyses, line item detail related to the Cash Available for Distribution figures, and the inputs and assumptions related to 8point3's net operating losses. (*See* Proxy 59 and 64).

40.  With respect to Evercore's *Peer Group Trading Analysis*, the Proxy (at pages 59-60) fails to disclose the individual trading multiples and current annualized dividend yield for the "renewable power dividend growth-oriented public companies commonly referred to as 'YieldCos'" relied upon by Evercore in valuing the Company. While the YieldCos were separated into four distinct groups—US, Canadian, International, and "Under Sale Process"—the Proxy fails to disclose even the high and low trading multiples or annualized dividend yield for the US and

Canadian groups, or the metrics for the single International and "Under Sale Process" companies. The failure to disclose these metrics is significant because the Company's implied valuation range based on the annualized dividend yield was $14.01 to $22.42 per share, which is significantly above the $12.38 Merger Consideration.

41. With respect to Evercore's *Precedent M&A Transaction Analysis*, the Proxy (at pages 60-61) discloses that "Evercore reviewed the EBITDA multiples paid in the selected historical transactions and derived a range of relevant implied multiples of transaction value to EBITDA," and then "applied this range of selected multiples to estimated 2018 EBITDA from the 8point3 Financial Projections – Base Case." However, the Proxy fails to disclose the individual EBITDA multiples for each disclosed transaction, or even the low, mean, median, or high multiples for the entire group. The Proxy simply discloses that Evercore derived a range of "10.0x to 12.0x for 2018 EBITDA."

42. The non-disclosed information discussed in ¶¶ 36-41, above, would be material to 8point3's shareholders in deciding how to vote their shares, as the real informative value of the financial advisor's work is not in its conclusion, but in the valuation analyses that buttresses that result. When a financial advisor's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion, as well as the key inputs and range of ultimate values generated by those analyses, must also be fairly disclosed.

43. The non-disclosed information discussed herein would be material to 8point3's shareholders in deciding how to vote their shares, as shareholders need to understand the motivations and conflicts that could potentially influence or prevent fiduciaries from acting solely in their best interests and that of the Company. Without the material disclosures discussed above, it is impossible for 8point3's shareholders to fully understand and interpret the financial analyses, including their impact on the fairness of the Merger Consideration, as well as to consider the

impact of potential conflicts of interest or bad faith that may have tainted the sales process, when determining whether to vote in favor of the Proposed Transaction.

## CLASS ACTION ALLEGATIONS

44. Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public holders of 8point3 Class A shares of limited partnership interests (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants.

45. This action is properly maintainable as a class action for the following reasons:

    a. The Class is so numerous that joinder of all members is impracticable. As of March 18, 2018, there were 28,093,305 Class A shares of 8point3 limited partnership interests, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

    b. Questions of law and fact are common to the Class, including, among others: (i) whether Defendants have violated Sections 14(a) and 20(a) of the Exchange Act in connection with the Proposed Transaction; and (ii) whether Plaintiff and the Class would be irreparably harmed if the Proposed Transaction is consummated as currently contemplated and pursuant to the Proxy as currently composed.

    c. Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

    d. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

    e. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for the party opposing the Class.

  f. Questions of law or fact common to class members predominate over any questions affecting only individual members.

  g. A class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

  h. Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, preliminary and final injunctive relief on behalf of the Class as a whole is entirely appropriate.

## CAUSES OF ACTION

## COUNT I

**Claim for Violation of Section 14(a) of the Exchange Act
and Rule 14a-9 Promulgated Thereunder
(Against All Defendants)**

46. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

47. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person . . . , in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

48. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that solicitation communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9(a).

49. Rule 14a-9 further provides that, "[t]he fact that a proxy statement, form of proxy or other soliciting material has been filed with or examined by the [Securities and Exchange]

Commission shall not be deemed a finding by the Commission that such material is accurate or complete or not false or misleading, or that the Commission has passed upon the merits of or approved any statement contained therein or any matter to be acted upon by security holders. No representation contrary to the foregoing shall be made." 17 C.F.R. § 240.14a-9(b).

50. As discussed herein, the Proxy misrepresented and/or omitted material facts concerning, *inter alia*: the financial analyses performed by 8poine3's financial advisor in support of its so-called "fairness opinion" that approved the Merger Consideration; and potential conflicts of interest and bad faith actions that may have tainted the Merger negotiation and sales process.

51. Defendants prepared, reviewed, filed and disseminated the false and misleading Proxy to 8point3's shareholders. In doing so, Defendants knew or recklessly disregarded that the Proxy failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

52. The omissions and incomplete and misleading statements in the Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote their shares. In addition, a reasonable investor would view such information as altering the "total mix" of information made available to shareholders.

53. By virtue of their positions within the Company and/or roles in the process and in the preparation of the Proxy, Defendants were undoubtedly aware of this information and had previously reviewed it, including participating in the Merger negotiation and sales process and reviewing Evercore's complete financial analyses purportedly summarized in the Proxy.

54. The Individual Defendants and General Partner undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Merger.

55. 8point3 is deemed negligent as a result of the Individual Defendants' and General Partner's negligence in preparing and reviewing the Proxy.

56. Defendants knew that Plaintiff and the other members of the Class would rely upon the Proxy in determining whether to vote in favor of the Merger.

57. As a direct and proximate result of Defendants' unlawful course of conduct in violation of Section 14(a) of the Exchange Act and Rule 14d-9, absent injunctive relief from the Court, Plaintiff and the other members of the Class will suffer irreparable injury by being denied the opportunity to make an informed decision as to whether to vote in favor of the Merger.

58. Plaintiff and the Class have no adequate remedy at law.

## COUNT II

**Claim for Violations of Section 20(a) of the Exchange Act**
**(Against the Individual Defendants)**

59. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

60. The Individual Defendants acted as controlling persons of 8point3 within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers or directors of 8point3, and participation in or awareness of the Company's operations or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

61. Each of the Individual Defendants were provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

62. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same. The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly connected with and involved in the making of the Proxy.

63. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the Exchange Act and Rule 14d-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons and the acts described herein, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

64. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

65. Plaintiff and the Class have no adequate remedy at law.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Ordering that this Action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B. Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

C. Directing the Individual Defendants to disseminate a Proxy that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D. In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

E. Directing Defendants to account to Plaintiff and the Class for their damages sustained because of the wrongs complained of herein;

F. Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

G. Granting such other and further relief as this Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED:  April 12, 2018                                GLANCY PRONGAY & MURRAY LLP

By: *s/ Lionel Z. Glancy*
Lionel Z. Glancy
Robert V. Prongay
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:  (310) 201-9150
Facsimile:   (310) 201-9160
Email: lglancy@glancylaw.com

**WOLF POPPER LLP**
Carl L. Stine
845 Third Avenue
Tel: (212) 759-4600
Fax: (212) 486-2093
Email: cstine@wolfpopper.com

*Attorneys for Plaintiff*

## PLAINTIFF CERTIFICATION
## UNDER THE FEDERAL SECURITIES LAWS

I, Robert Clem, hereby state:

1. I have reviewed the complaint against 8point3 Energy Partners LP ("8point3") and certain of its directors and officers. I have authorized the filing of a complaint and lead plaintiff motion on my behalf.

2. I am willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

3. I currently own 300 8point3 shares. I purchased 100 of those shares in the first quarter of 2016 and 200 of those shares in the 4th quarter of 2016. The average purchase price for those shares was $13.99 per share.

4. I did not purchase these securities at the direction of counsel, or in order to participate in any private action arising under the federal securities laws.

5. During the three-year period preceding the date of signing this certification, I have not made a motion to serve, and have not served, as a lead plaintiff on behalf of a class in any private action arising under the federal securities laws.

6. I will not accept any payment for serving as a representative party on behalf of the Class except to receive a pro rata share of any recovery, or as ordered or approved by the Court, including the award to a representative party of reasonable costs and expenses, including lost wages relating to the representation of the Class.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 12th day of April, 2018

By: _____
Robert Clem